Allison W. BURD, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 541–87 C.

United States Claims Court.

Feb. 15, 1990.

James R. Fitzgerald, atty. of record, for plaintiff.

Anthony H. Anikeeff, with whom were Asst. Atty. John R. Bolton, Asst. Director Thomas W. Petersen, and Director David M. Cohen, Washington, D.C., for defendant. Lieutenant Colonel Lawrence B. Hagel, Dept. of the Navy, Washington, D.C., of counsel.

## OPINION

WIESE, Judge.

Plaintiff is a former gunnery sergeant in the United States Marine Corps who was discharged from military service on August 15, 1983, on the basis of an Administrative Discharge Board finding that he had engaged in homosexual conduct in contravention of Navy rules and policy. Plaintiff challenged the correctness of this finding in an application for correction of records submitted to the Board for Correction of Naval Records (BCNR) on October 17, 1986. He was not successful.

Plaintiff is now before this court asking that we reverse the BCNR's decision. The essence of the complaint is that the administrative discharge proceeding was tainted by procedural error. Plaintiff seeks reinstatement to active duty together with back pay and retirement benefits. The case is presented through cross-motions for summary judgment. We hold for plaintiff.

### I

On June 21, 1983, a Marine Corps Administrative Discharge Board convened to consider the removal from service of plaintiff, Gunnery Sergeant Allison Burd, for alleged homosexual conduct.[1] The principal evi-

---

1. Marine Corps regulations declare that homosexuality is "incompatible with service in the Marine Corps" and require that a marine "shall be separated" if found to have engaged in a

dence against plaintiff was the sworn written statement of Lance Corporal Robert Contreras, a student at the Noncommissioned Officers Leadership School (NCO School), Parris Island, South Carolina, where plaintiff served as the noncommissioned officer-in-charge. Contreras alleged that plaintiff had attempted to commit a nonconsensual homosexual act with him during an outing in Charleston, South Carolina, over the weekend of January 15, 1983.

Also offered against plaintiff were (i) his service record book, (ii) the oral testimony of Lance Corporal Brown, a student at the NCO School who had accompanied plaintiff and the alleged victim on the Charleston excursion, and (iii) five Naval Investigative Service (NIS) reports dating back to 1971 that detailed previous allegations of homosexual conduct by plaintiff.

Plaintiff testified on his own behalf and also offered testimony of several character witnesses, including his wife. After evaluation of the evidence, the Administrative Discharge Board determined that plaintiff had engaged in homosexual conduct and recommended that he be discharged from service with a General Discharge.

Three years later, plaintiff petitioned the BCNR to upgrade his discharge to Honorable and to assign an appropriate reenlistment code. His application to the BCNR alleged various "constitutional" defects in the procedures applicable to the administrative discharge proceeding including (i) the absence of any requirement for the attendance at the hearing of the principal witness against him (Contreras), (ii) the failure to conduct the hearing while the principal witness was still stationed at the same base, (iii) the failure to take the deposition of the principal witness in order to permit cross-examination and, finally, (iv) the ineffective assistance of counsel.

The BCNR examined each of these arguments and found them wanting. In addition, the BCNR, acting on its own motion, took up the question whether the Discharge Board had erred in admitting into evidence the NIS reports of earlier allegations charging plaintiff with homosexual conduct. The BCNR concluded that the admission of these reports was error. At some point, said the BCNR, "an individual is entitled to have laid to rest allegations which have been found to be unsubstantiated. In [plaintiff's] case, this means that after the first ADB,[2] [he] should not have been compelled to respond to the 1971–1978 allegations of homosexual acts." (Footnote added.)

However, the BCNR went on to conclude that "even if the evidence concerning the earlier allegations of homosexuality had been excluded, the evidence concerning the 15 January 1983 incident would have resulted in [plaintiff's] discharge." As the BCNR reasoned it, this result followed from the fact that (i) "the ADB specifically found that [plaintiff] committed a homosexual act in 1983," (ii) "the evidence relating to that allegation, standing alone, clearly shows that [plaintiff] committed such an act," and (iii) "[a] finding by an ADB that a service member has committed a homosexual act makes discharge mandatory in virtually all cases." The BCNR concluded that plaintiff had demonstrated neither a material error nor an injustice and therefore denied relief.

Plaintiff filed suit here on August 31, 1987.

## II

In the complaint before us, plaintiff has refocused his arguments to allege a claim of ineffective assistance of counsel narrowed to two specifics: (i) counsel's failure to depose Contreras or to require his attendance at the hearing and (ii) counsel's

---

homosexual act, unless specified exigent circumstances exist. Marine Corps Separation and Retirement Manual (MARCORSEPMAN) ¶ 6207.

**2.** The reference in the quoted text to the "first ADB" refers to a September 1978 administrative discharge board proceeding that had been con-

vened to consider various incidents of alleged homosexual conduct attributed to plaintiff during the years 1972 through 1978. The 1978 proceeding resulted in a recommendation that plaintiff be retained.

failure to oppose the introduction into evidence of the NIS reports detailing prior instances of alleged homosexual activity. These alleged shortcomings of counsel, claims plaintiff, denied him a fair hearing and rendered his discharge procedurally defective.

In view of the disposition we reach, we find it unnecessary to extend the discussion beyond the second of these grounds—the admission into evidence of the NIS reports. Further, since the BCNR has already ruled that admission of the NIS reports constituted error, it becomes a moot point to question whether counsel was remiss in not challenging that evidence initially. The only question that needs to be examined, therefore, is whether the BCNR was correct in concluding that the error was harmless. We start with that.

■ The applicable standard is set forth in the regulation governing the operation of the Naval Discharge Review Board, Secretary of the Navy Instruction (SECNAVINST) 5420.174C. This regulation deems an error to be prejudicial where "there is substantial doubt that the discharge would have remained the same if the error had not been made." Pursuant to this regulation, the BCNR undertook an independent assessment of the evidence and concluded that the evidence, even when evaluated without regard to the NIS reports, clearly supported the administrative finding that plaintiff had been involved in a homosexual act or attempt. Therefore, it was the BCNR's judgment that plaintiff had not been prejudiced by the error, i.e., the error was harmless. We disagree with this conclusion; the BCNR's analysis of the problem reflects a misunderstanding of the harmless error rule. However, before explaining that point in more detail, we first address the Government's contention that the court is bound by the BCNR's determination if that determination is supported by substantial evidence. Here, too, we disagree.

The substantial evidence standard is applicable to situations where courts are reviewing agency adjudications of fact. *See* 5 U.S.C. § 706(2)(E) (1988); *Consumers'*

*Union v. Federal Trade Comm'n,* 801 F.2d 417, 422 (D.C.Cir.1986). That is not our concern here. The issue the BCNR was addressing—and, in turn, the question we now reexamine—has to do with the effect of facts on a decision-maker rather than with the determination of facts by a decision-maker. Thus, the issue is one of law, *Interstate Commerce Comm'n v. Louisville and Nashville R.R.,* 227 U.S. 88, 92, 33 S.Ct. 185, 187, 57 L.Ed. 431 (1913) ("[T]he legal effect of evidence is a question of law."), and, as such, it is an issue that a reviewing court is free to decide for itself without regard to the strictures of the substantial evidence test. *See* 5 U.S.C. § 706(2)(A); *Alexander v. Federal Energy Regulatory Comm'n,* 609 F.2d 543, 546 (D.C.Cir.1979).

■ Moving on to the merits of the issue, we acknowledge at once that an objective evaluation of the evidence properly before the Administrative Discharge Board could reasonably support a finding of homosexual conduct on plaintiff's part. But the test of whether an error may be deemed harmless is not—as the BCNR's approach suggests—whether the record, when purged of the inadmissible evidence, can still be seen to support the decision that was reached. Rather, the test is whether that evidence *influenced* the decision that was reached.

"The crucial thing," the Supreme Court has explained, "is the impact of the thing done wrong on the minds of other men, not one's own...." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [*Id.* at 765, 66 S.Ct. at 1248.]

Only if the reviewing court "is sure that the error did not influence the jury, or had but very slight effect" may the judgement stand. *Id.* at 764, 66 S.Ct. at 1248.

Thus, reversal is required unless the reviewing court "believes it highly probable that the error did not affect the judgment." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2883 (1973).[3] Or, to put it in terms of the Marine Corps' regulation, "substantial doubt" exists unless the reviewing court can be certain that the error did not influence the result.

■ Such a conviction is not possible here. A fair measure of the importance of the NIS reports to the decision of the Administrative Discharge Board may be gleaned from the probative significance which the Government itself attributed to those reports in the presentation of its case. The following statements from the record of the administrative hearing provide a first-hand view. We begin with an exchange between plaintiff's counsel and plaintiff's commanding officer, the individual who had initiated the proceedings against plaintiff (but who later appeared as a witness in his behalf):[4]

Q: Captain ..., have you read the NIS reports in relation to Gunnery Sergeant BURD's case?

A: I have read the most recent report [the report containing Contreras' statement] and it referenced the other reports. I didn't get to read them.

Q: What is your opinion of that report?

A: I think that report said a lot but it doesn't conclude anything. *It leaves a lot of open doors, as far as I am concerned.* [Emphasis added.]

On cross-examination the witness was asked why he had not reviewed the other NIS investigative reports. His answer was that the records had not been available to him. Thereupon the recorder (the individual presenting the evidence against plaintiff) urged that a recess be taken to permit the witness to read the NIS reports. The recorder gave this reason:

REC: The government would argue, sir, that the officer who initiated the discharge package was not privileged to the information contained in those investigations. Therefore, his opinion as to whether the respondent should be retained or discharged [the witness had urged retention] is based solely on that investigation. *Had he seen the other investigations, the government contends that there is a possibility that his opinion could have changed.* [Emphasis added.]

Again, in closing argument, the recorder returned to the significance of the NIS reports, saying initially:

The information [that] has been presented to the board regarding the alleged incidents of homosexuality have come from competent authority, the Naval Investigative Service. In view of the circumstances surrounding the most recent allegation of homosexuality *and the past record of the respondent regarding homosexuality,* the government contends that there is sufficient grounds to separate the respondent for homosexuality. [Emphasis added.]

And, at a later point in his summation:

If you look at the evidence that the government has provided you, look at the NIS report that was done in January of this year. *And look at the evidence presented on the incidents that go all the way back to, I believe, 1971.* Look at the conversations that were held between the respondent and the victims. They relate a very similar story. The approach was almost identical. The information used was almost identical. The respondent went to a General Court–Martial on the West Coast, Camp Pendle-

3. The above text is quoted from Justice Traynor, The Riddle of Harmless Error 35 (1970). Justice Traynor explains:

Any test less stringent entails too great a risk of affirming a judgment that was influenced by error. Moreover, a less stringent test may fail to deter an appellate judge from focusing his inquiry on the correctness of the result and then holding an error harmless whenever he equated the result with his own predilections.

*Id., quoted in* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2883 n. 20 (1973).

4. The testimony of this witness explains that he had been directed by higher command to initiate the charges against plaintiff.

ton. He is processed for an Admin Board here. The facts are almost identical. How can that be? You are going to have to decide that as members. I realize the Corps is a small place and we have not a great number of duty stations, but I doubt a story of this nature and those type of facts travel that fast over that period of time with the same accuracy. [Emphasis added.]

In view of these comments and the acknowledged emphasis they place upon the importance of evaluating the 1983 incident in light of plaintiff's history of alleged homosexuality, it would defy common sense to conclude that the NIS reports did not influence the decision against plaintiff. Those reports went to the very heart of the Government's case.

Nor could it be said with any conviction that the outcome would have been the same even if the NIS reports had not been made a part of the record. Without getting into all of the details of the events in question, the following comments offer a fair sense of the competing evidentiary considerations.

To start with, Contreras did not claim with certainty that plaintiff had made a homosexual attempt against him. Rather, what Contreras reported to the NIS (and what his written statement reveals) is his belief that such an attempt was in progress when he was awakened from his sleep. ("I recall that I awoke to discover that someone had undone my belt, my snap and unzipped my zipper.... When I first woke up I felt someone pulling the blanket down and when I opened my eyes Burd fell to the floor and pretended to be asleep. I honestly don't know if Burd ever touched my genitals but by the way he was acting I had a feeling he had.")

Notwithstanding the absence of certainty in Contreras' statement, what can be seen to confirm the truth of his suspicions are the surrounding circumstances. First of all, there were overtures of friendship and discussions of homosexuality which plaintiff apparently initiated soon after Contreras' arrival at the NCO School. This plaintiff did not deny. Next, and perhaps most

damaging, is the implausibility of plaintiff's explanation of why he accompanied Contreras and Brown on their trip to Charleston. The story was that he went along out of concern for Contreras' welfare—a concern allegedly prompted by the belief that Contreras was then under the influence of either drugs or alcohol and hence a danger to himself and others.

The problem with this explanation lies in the inconsistency of plaintiff's actions. While the claim was that Contreras appeared intoxicated, plaintiff bought or at least sanctioned the purchase of beer on the way to Charleston. Moreover, plaintiff failed to report Contreras' alleged polydrug use to the proper authorities or to insist that he turn himself in for rehabilitation, an omission to act markedly at odds with the concern for Contreras' welfare that plaintiff offered as the explanation for accompanying Contreras to Charleston in the first place.

Moving beyond the immediate facts of the event in question, we note that plaintiff denied that he was a homosexual or that he had ever engaged in homosexual conduct or attempted to solicit another person's participation in such conduct. Moreover, plaintiff's wife emphatically supported his denial ("Do you believe your husband is a homosexual?" "No, in no way."), and his command superiors testified similarly, *i.e.,* that on the basis of daily association none ever had occasion to suspect plaintiff of being a homosexual.

A further consideration in plaintiff's favor is that he enjoyed an outstanding reputation as a gunnery sergeant and was held in the highest regard by his command superiors. Among the witnesses who appeared in plaintiff's behalf was a Marine Corps colonel with over 24 years of active duty service. When asked how he would rank plaintiff's performance in relation to other gunnery sergeants he had known, the colonel responded: "Well among the top." A similar endorsement of plaintiff's performance came from another officer—a lieutenant colonel with over 18 years of active duty in the Marine Corps. This witness called plaintiff's performance "outstand-

ing": "He [plaintiff] is one of the few individuals that I, as a Reviewing Officer, recommended for accelerated promotion."

Taking these various considerations into account, the question we are left with is whether one can say with any sense of conviction—that is, without substantial doubt—that the Administrative Discharge Board's determination would have remained the same without the NIS records. The answer has to be no. Without the corroborative support of the NIS records (the instances of similar conduct they recited) Contreras' account would exist almost in a vacuum, and the strength of the Government's case would rest largely on the implausibility of plaintiff's own refutation. In that circumstance, it would not be unreasonable to assume that, considering plaintiff's reputation and military record (he had over 18 years of service including two tours in Viet Nam and numerous decorations), the members of the Administrative Discharge Board might have resolved any doubts in his favor. Since this outcome was clearly within the range of possibility, it follows that the admission of the NIS reports was prejudicial error.

### III

For the reasons stated, the findings of homosexual conduct that were entered against plaintiff by the Administrative Discharge Board on June 23, 1983, and the affirmance of those findings in the decision of the Board for Correction of Naval Records, entered January 21, 1988, reflect determinations made pursuant to an erroneous legal standard and are therefore of no force or effect. Plaintiff's discharge having been unlawfully accomplished, he is entitled to (i) back pay measured from the date of discharge (August 15, 1983) through the end of his then-current enlistment period (February 26, 1985) reduced by any interim earnings, with the necessary correction of his military record to reflect same and (ii) further correction of his records to reflect a discharge under Honorable Conditions together with an appropriate modification to his reenlistment code.

By April 1, 1990, the parties shall file a stipulation for entry of judgment the terms of which identify the amount of the monetary award due plaintiff and also recite the specific relief (*i.e.*, the correction of records) to which plaintiff is entitled pursuant to this decision. Thereafter, the Clerk shall enter judgment accordingly.

Plaintiff's cross-motion for summary judgment is granted and defendant's motion for summary judgment is denied.